# EXHIBIT 1

.8

YH.J 89/1.103/35

# A POSSIBLE PROTOCOL TO THE BERNE CONVENTION

# HEARINGS

BEFORE THE

## SUBCOMMITTEE ON INTELLECTUAL PROPERTY AND JUDICIAL ADMINISTRATION

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED THIRD CONGRESS

FIRST SESSION

APRIL 29 AND MAY 27, 1993

## Serial No. 35



GOV'T. DEPOSITORY

AUG 30 1994

HAMPDEN LAW LIBRARY

BOSTON PUBLIC LIBRARY
GOVERNMENT DOCUMENTS DEPARTMENT

Printed for the use of the Committee on the Judiciary

U.S. GOVERNMENT PRINTING OFFICE

77–315 CC          WASHINGTON : 1994

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-044594-9

77–315 O – 94 – 1

Exh. 1

9

87

time to testify before us today. He's honed in that southern California concept Mr. Berman referred to.

Jay Roth, the other half of the panel and a frequent colleague of Bob's in calm, theoretical debates on copyright is a partner with Taylor, Wright, Bush & Gebner. They represent labor organizations, guilds and trust funds in labor, entertainment, bankruptcy and transactional matters.

He appears as counsel to the Screen Actors Guild, Directors Guild and Writers Guild and is representing those groups in the Berne Protocol and new instrument proceedings.

We welcome you here today. We have your testimony. Without objection, it will make a part of the record in full. We hope you can summarize because we have read your testimony. But you may proceed as you see fit. We will begin with you, Mr. Roth.

## STATEMENT OF JAY D. ROTH, COUNSEL, DIRECTORS GUILD OF AMERICA, SCREEN ACTORS GUILD, AFL–CIO, AND WRITERS GUILD OF AMERICA, WEST, BURBANK, CA

Mr. ROTH. Good morning, Mr. Chairman and members of the subcommittee.

On behalf of the Directors Guild, Screen Actors Guild, and Writers Guild of America, West, and the 100,000 artists they represent, we thank you for the privilege and opportunity to appear at this hearing and to address you this morning.

I intend to summarize this morning the main points of my written testimony.

We seek the broadest implementation of national treatment in intellectual property and the end to discrimination against American writers, directors, performers and producers in the field of international copyright and trade.

National treatment is a fundamental and critical principle of intellectual property. It is fundamental and critical because it requires that states grant the same protection to foreign creators and artists that they grant to their own.

Such a regime encourages creativity and the development of intellectual property, something that is an essential matter of interest to the citizens and economies of the world.

National treatment in intellectual property matters removes creativity and artistry and the barriers that frequently have been created in trade disputes allowing the world at large to benefit from unimpeded intellectual property growth.

The principle of national treatment is under attack on many fronts in Europe.

An assortment of legal and extralegal rationales have been developed to transform traditional national treatment applications to pure and simple matters of unequal treatment and discrimination for trade purposes.

Reciprocity, first fixation, material and subjective reciprocity, Berne exceptions based upon new rights and social funds are devices that have been used to deny U.S. actors, directors, writers and producers hundreds of millions of dollars to date.

These seemingly innocuous terms and applications are becoming a trend which if not stopped will potentially lead to a war in world

10

88

intellectual property and the loss annually of hundreds of millions of dollars to the U.S. community.

The underlying purpose of copyright is to reward creativity and encourage individual effort through economic incentive.

Various European countries and the European Community have in part recognized this objective by providing for rights of ongoing equitable remuneration for various uses of creative and artistic work in statutes, EC directives and EC draft directives.

Levies have been enacted to provide remuneration to directors, writers, performers and producers whose works are being copied and being rented.

We applaud this effort and statement of social purpose but decry the hypocrisy of its application.

If creativity is to be encouraged and protected, and if those whose works are being copied or rented are suffering an economic detriment, how can a state legally and morally justify placing levies on blank tapes, taping machines and rentals for the benefit of creators and artists and then use the fruits of those levies for creators and artists other than those who suffered the detriment.

This is exactly what is occurring today in Europe and what threatens to be an increasing trend. The Berne Convention protects authors' rights to national treatment in all signatory states to the convention.

Yet it has been argued and applied in the face of Berne's specific provision "for laws now or hereafter granted" that new rights such as blank taping and rental are not included in the Berne Convention.

It has also been asserted that Berne treatment does not have to be complied with when one state is out of compliance with the provisions of Berne in the judgment of another contracting state.

What does it mean to intellectual property if Berne national treatment is subjective? We believe there is great potential for anarchy.

The levies being collected in Europe are not insignificant. The current audio and audiovisual collections in just a portion of the community exceed $300 million annually.

These amounts could easily triple with the full implementation of the taping and rental directives and their extension throughout the community.

What occurs with American intellectual property which represents a substantial part if not a majority of the works affected by the levies? We receive less than 10 percent.

First, social fund deductions are used to subsidize the internal markets for the benefit of that market film industry.

In France, this amounts to 25 percent or in 1992, $25 million U.S. dollars annually. In Austria, the social fund is 51 percent. In Finland, 66 percent.

Second, performers and producers are completely excluded. Thus in France they are excluded in sharing from an additional $50 million annually. Those are 1992 dollars.

The remaining authors share of $25 million is subject to our participation. The American share of less than $10 million is divided pursuant to a settlement agreement between the directors and writers and U.S. producers.

11

89

There is no guarantee, however, that these small collections will continue. I should note that there is a similar agreement between the Screen Actors Guild and the U.S. producers.

However, there have been no collections under this agreement because of the denial of national treatment to U.S. producers and performers.

The Europeans utilize the differences between our system as part of the basis for denying national treatment. Little recognition is given to the U.S. collective bargaining system and the hundreds of millions of dollars in residuals generated annually for creators and artists by it.

Less recognition is given to the fact that European actors, directors and writers have received national treatment under U.S. agreements and millions of dollars in residuals.

This is not to say that we believe all is without need of repair here. The European statutory approach to ongoing equitable remuneration offers protections to artists and creators that do not exist in the United States.

The significant challenges to collectively bargained residuals that have been posed by dozens of entertainment bankruptcies and the increasing exchange and transfer of film products that are subject to residuals without the assumption of obligations by the purchaser has exposed the severe limitations of the U.S. bargaining approach.

The Europeans are correct that copying, particularly digital copying, does affect the future of intellectual property.

The United States is not currently examining protections or remuneration in the audiovisual copying field. We believe that the WIPO initiatives for a Berne Protocol and new instrument are commendable.

But with respect to solving the problem of national treatment, they are very significant limitations.

While referring these measures as cancers, the Berne protocol draft does not solve national treatment avoidance measures such as the requirement of first fixation or of social funds.

The new instrument does not require national treatment for any audiovisual work whatsoever. So U.S. participation in new instrument will not result in one penny of collection for audiovisual works.

Finally, there is the question of how many years we have before there is any WIPO resolution at all. There is much to be done to protect the fundamental principle of national treatment.

The WIPO initiative has clear limitations. We must seek resolution in other forums as well. It is our view, given the trade related nature of this matter, that GATT is an appropriate forum as to both timing and content.

Mr. Chairman, members of the subcommittee, on behalf of the Directors Guild, Screen Actors Guild and Writers Guild of America, West, I'd like to thank you for inviting us here to testify.

We looking forward to working with you in accomplishing the broadest national treatment for American interest. Thank you.

Mr. HUGHES. Thank you, Mr. Roth.

[The prepared statement of Mr. Roth follows:]

90

PREPARED STATEMENT OF JAY D. ROTH, COUNSEL, DIRECTORS GUILD OF AMERICA, SCREEN ACTORS GUILD, AFL-CIO, AND WRITERS GUILD OF AMERICA, WEST, BUR-BANK, CA

### INTRODUCTION

I am Jay Roth, counsel to the Directors Guild of America, Screen Actors Guild, AFL-CIO, and Writers Guild of America, West. My clients represent approximately 100,000 performers, directors and writers in the American motion picture and television industry. The members of these three creative guilds represent a substantial percentage of the creative and performing heart of the industry. Mr. Chairman, we thank you and the Subcommittee for the opportunity to appear at this hearing and address you this morning.

This testimony is offered in support of the broadest possible implementation of National Treatment in international intellectual property areas, and the end to de facto discrimination against American writers, directors, performers and producers in the fields of international copyright and trade.

While the principles of copyright and author's rights [1] (*Droits D'Auteur*) have developed state to state with differing systems and levels of protection for authors and performers, the principle of National Treatment has been, and we believe should be, the internationally recognized standard, especially as it relates to artistic creators. The recognition of National Treatment by the original Berne signatories over a century ago reflected the understanding that creative and artistic work has no borders, and that for full economic and cultural development, society must protect with equal treatment and without discrimination the creators and artists of all nations. It should be noted that although Berne mandates only minimum levels of protection, and does not require contracting states to raise their levels of protection to those of other contracting states, it does, through the principle of National Treatment, require that nationals of other countries signatory to Berne be treated equally with the host nation's citizens in matters of intellectual property.

The development of technology has of course required responses in the form of legal protection for creative and artistic works. Sound recordings, radio, motion pictures, television, the rental and lending of audio and audiovisual works, and the copying of those works onto blank tapes have each presented significant issues that have been addressed by various forums as to the requisite level of protection for creators and artists. The development of new technologies and levels of protection has not occurred uniformly nation to nation. As uneven economic rights and different levels of protection have developed, issues related to whether there should be National Treatment regarding those new levels of protection for nationals of other states have come to the fore. Opposition to National Treatment has been voiced in the call for Reciprocity or Material Reciprocity [2] as the rule of law in international intellectual property. The rule of reciprocity is frequently urged by those states which seek to compel other states to adopt their terms of protection, or which seek unfair economic advantage in intellectual property matters for their artists and creators.

### THE CHALLENGE TO NATIONAL TREATMENT

In certain European countries, legislation has established levies on blank tapes, recording devices and video rentals. The stated legislative purpose of these statutes is the economic protection of authors, performers and producers whose works are being copied or rented. The need for protection is based upon the sound judgment that copying and renting reduces demand for the development of other works, and further, that those who created or developed audio or audiovisual works should in any event participate in the income stream produced by these new means of exploitation.

---

[1] There are significant distinctions between the "copyright" and author's rights' systems. While U.S. law recognizes the producer as the author of a film, granting him copyright protection, author's rights states consider that the author must be a physical person. Certain rights remain with the physical person without regard to "ownership" under these systems.

[2] Reciprocity "means that a given provision in the national law applies to foreigners only if, and to the extent to which *their* country provides for the right and makes it available to foreigners" (WIPO International Bureau 3/12/93 draft. BCP/CE/111/2-111 ¶ 25, paragraph 83). Material Reciprocity or "subjective reciprocity" means that a state may look to the law of another state and make a subjective judgment about whether protection in each is equivalent. This determination is used as the basis to determine whether protection to the foreign national will be provided. Subjective reciprocity is, at its core and at its worst, a mandate to ignore fairness and legal protections at will.

91

The audiovisual levies on blank tapes in Germany (Art. 54 German Copyright Act) and France ("Copie Priveé," Copyright Revision Act adopted 3 July 1985), adopted in 1982 and 1985[3] respectively, in 1992 generated in excess of Two Hundred Million U.S. Dollars ($200,000,000.00). Similar levies have been adopted in Spain, Italy, Switzerland, Austria, and the Netherlands. Other countries throughout Europe have either adopted or are in the process of adopting blank taping levies. While the directive is currently in draft form, it is anticipated that the European Community will adopt a blank taping levy as part of the harmonization process.[4] Common to all of the existing statutes and the proposed EC draft is the rejection of the principle of National Treatment.

Levies on the rental of audio and audiovisual tapes are not as prevalent as those for blank taping. Of the major European countries, only Germany (Art. 27) currently has collections on rentals. The EC, however, has adopted a rental directive for the Community which also, because of the requirement of reciprocity, denies protection and shares of remuneration to American performers and producers.

The rejection of National Treatment for the Rule of Reciprocity is well exemplified by the French application of their audiovisual levy of 1985, "Copie Priveé."

At the outset, twenty-five percent (25%) of all funds collected in any year are deducted for social purposes. Thus, in 1992, where there were collections of approximately One Hundred Million Dollars ($100,000,000.00) in France, Twenty-five Million Dollars ($25,000,000.00) was allocated to social uses (i.e., social welfare, training, development) for film authors, performers and producers.[5]

The denial of National Treatment does not stop here. The remaining funds are divided into three (3) shares: authors, performers and producers, each receiving twenty-five percent (25%). Under the French law, producers and performers are considered to be "neighboring rights"[6] holders who are only entitled to protection if their work is first fixed (recorded) in France or if they are nationals of a state signatory to the Rome Convention. Thus, American producers and performers received *none* of the Fifty Million Dollars ($50,000,000.00) allocated to their interests in 1992. The American share of this sum was distributed to French performers and producers.

The fixation requirement is a denial of National Treatment to all works except those produced in France, and the requirement of Rome signatory status for producers and performers as applied to audiovisual works is little more than legal sophistry. The Rome Convention makes no reference whatsoever to the audiovisual producer. With respect to audiovisual works, protection under Rome for performers is strictly limited to the right to authorize whether their performance will be fixed. once this occurs, no other rights granted to performers under Rome (i.e., Art. 7, reproduction and broadcasting rights, and Art. 12, rights to remuneration) are afforded. (Article 19, Rome Convention. See also WIPO Guide to the Rome Convention, 19.5-19.10.)

The argument that Rome signatory status is a condition for receiving National Treatment for audiovisual works is thus specious, given that Rome essentially does not address audiovisual works or their producers and performers. On the issue of

---

[3] While this testimony has focused on audiovisual levies, there are comparable audio levies in France, Germany and other European countries. Such levies will be the subject of harmonization throughout the European Community.

[4] The process of harmonization is intended by the EC through various directives to require minimum levels of protection for intellectual property throughout the international market of the Community. Collections under the audio levies are approximately thirty percent (30%) of the audiovisual levies. Reciprocity is applied under these levies as well.

[5] Social Funds exist in almost all of the European statutes. By limiting their availability to nationals of the particular state, the Social Funds themselves are denials of national (equal) treatment. The following are examples of social fund charges: Austria - 51%, Spain - 20%, Holland - 15%, Italy - 5%, Germany - 2%, Bulgaria - 20%, Denmark - 33%, Finland - 66%. These social funds are thinly disguised subsidies for various countries' film industries. The International Bureau of WIPO's Memorandum of March 1993 proposes:

> that no remuneration due to foreign authors or other foreign owners of copyright be used without the authorization of such authors or other owners of copyright, given directly or through persons or bodies representing them, for any purpose other than the distribution of such remuneration among the authors or other owners of copyright concerned (BCP/CE/111/2-111, page 36 ¶142). (N.B., similar prohibitory language is present in the New Instrument draft. INR/CE/1/2 p. 28 ¶86)

This witness agrees with WIPO's International Bureau that mandatory social fund deductions should not be permitted by the Protocol or New Instrument.

[6] Under the European system, performers, film and phonogram producers, and broadcasting organizations are not considered to be copyright holders. Their rights as neighboring rights holders are considered to be rights related to copyright or related rights. Under such a construct, Berne National Treatment protection is inapplicable to all of these categories.

92

whether U.S. law offers rights that are reciprocal to Rome, U.S. substantive law gives to performers (whether U.S. or foreign) the same sole substantive right that audiovisual performers are granted under Rome, the right to authorize whether their work will be first fixed.[7] As U.S. law grants the right of fixation to U.S. performers, the argument that either the lack of Rome signatory status or the lack of an equivalent level of protection in the U.S. for fixation rights has little substance.

It should be noted in this regard that the National Treatment provisions of the proposed New Instrument, which are quite favorable as to what rights holders are covered in the instrument, offer no solace for audiovisual performers and producers.

The New Instrument, as currently drafted, does not address audiovisual works. In fact, the International Bureau's Memorandum provides that, pending clarification from the governing bodies of WIPO, "…this Committee of experts should not discuss questions covering audiovisual fixations. It is for this reason that the present memorandum does not deal with audiovisual fixations." (INR/CE/I/2, 3/12/93, pg. 5, ¶ 10) The adoption of the New Instrument as drafted will not grant National Treatment to audiovisual works, and thus will not result in American participation in the producers' or performers' share of the audiovisual blank taping or audiovisual rental levies. The non-inclusion of audiovisual works in the New Instrument means that U.S. signatory status to the proposed Berne Protocol and New Instrument will not cure this ill.

As a result of Berne's National Treatment requirements, American directors and writers, as well as American producers who assert "authorship" under U.S. law, have participated to date in the collections related to the author's share of the levies in Germany, France and Austria. The division of the levy collections of American writers, directors, and producers is governed by a settlement agreement between the major motion picture companies and the Directors Guild (DGA) and Writers Guild (WGA). The Guild-Motion Picture Companies Agreement executed in 1990 has a term of five (5) years, its scope includes blank taping and rental levies, and it is worldwide and retroactive. The agreement has fostered significant cooperation between American writers, directors and producers in their common effort to collect the author's share of the levies. Both the agreement and the resultant cooperation are the products of the parties' attempts to reconcile the different American and European legal perspectives on authorship and authors' entitlement to remuneration. The parties' agreement avoids resolution of the conflicts of law and other legal issues in favor of a pragmatic resolution. As a result of the agreement, clouds that were raised by various European collecting societies and governments regarding the rights of various parties to collect the levies have been resolved, and funds which were frozen pending resolution of entitlement issues have been distributed.[8] American collections to date from France, Germany and Austria are approximately Fifty Million Dollars ($50,000,000.00), with American directors and writers receiving in excess of Seven Million Dollars ($7,000,000.00) of these collections.

While these sums are substantial, they represent a small portion of the total collections (as a result of exclusion from the performers' and producers' shares) and an inappropriate share of the author's share. For example, in Germany, before allocation of shares to film, a five percent (5%) social deduction is made. After this deduction, fifty percent (50%) is allocated to performers, music and other "rightsholders" from which the U.S. receives no share for performers or other "rightsholders." Of the remaining forty-seven and one-half percent (47.5%), fifty-six percent (56%) of the levy is allocated to German films and forty-four percent (44%) to foreign films. Of the forty-four percent (44%) allocated to foreign films, the U.S. receives sixty percent (60%) or twenty-eight percent (28%) of the sum allocated to films. Thus, American films in actuality are allocated a twelve and a half percent (12.5%) share of the total. There is little doubt that the American share of the movies and television product being exhibited, aired and taped in Germany exceeds twelve and a half percent (12.5%). Similar patterns of underestimating the American share exist in other European countries. Thus, while American interests participate in author's share collections in Europe, we are denied substantive National Treatment due to the methods of share calculation.

---

[7] The Register of Copyrights, Ralph Oman, addressed this subject in his March 29 testimony before this Committee. "…The ability of a performer to prevent unauthorized fixations and reproductions of his or her live performance is deemed to be so fundamental that legislators and courts alike are willing and prepared to find creative solutions to ensure basic fairness and justice. Because such protection is so fundamental, it is not tied to reciprocity or obligations under existing international conventions. The nationality of the performer and the location of the performance have no relevance to any determination under U.S. law." (Oman testimony, p. 14.)

[8] The German Patent Office declined to approve a distribution scheme for Americans under the German law of 1982 until the Motion Picture Companies-Guild agreement was executed in 1990.

93

The Screen Actors Guild and the Motion Picture Companies have a five (5) year agreement that is similar to the motion picture companies' DGA/WGA agreement. To date, there have been no collections under this agreement because of the application of the previously discussed rules of reciprocity to the performers' share. That is, the rejection of National Treatment and the interpretation of the reciprocity and first fixation issues results in U.S. performers and producers being totally shut out of their share.

There is no certainty that America's Berne signatory status and the National Treatment requirements of the convention will result in the continued collection of the author's share by American authors. There is increasing popularity in Europe to the argument that the scope of Berne's National Treatment requirement is limited to those rights specifically enumerated in Berne, and that the scope of Berne does extend to new rights. The argument follows that as blank taping and rental are "new rights," there is no requirement that a Berne signatory provide National Treatment to another signatory state's authors. Using this analysis, Denmark, a Berne signatory, denies to U.S. authors any portion of the author's share. It is this argument that the International Bureau of WIPO refers to as a "transmission and proliferation of the cancer of denial of National Treatment" (BCP/CEIII/2-111 p.28-9, paragraphs 98-9).

There are two additional aspects of this discussion of the denial of National Treatment that must be considered.

The Anglo-American and European systems as they relate to the rights at issue are dissimilar. The Europeans have chosen to create statutory rights of remuneration to protect their creative community, while the U.S. system relies on the collective bargaining system and individual negotiations in which the power of the Guilds and artists is often disproportionate to the power of their multi-billion dollar multinational employers.[9] There are advantages and disadvantages to both systems, the discussion of which is extensive and beyond the scope of my testimony on National Treatment. It is important, however, to recognize that those in Europe who argue for reciprocity and about the lack of rights in the U.S. for the creative community have paid little attention to our collective bargaining agreements and residuals system, which provide for ongoing payments for reuse of motion picture and television product.[10] Residuals are paid under the U.S. collective bargaining agreements regardless of the nationality of the performer, writer or director. For example, there are scores of actors, directors, and writers from Europe who have each received residuals in excess of One Hundred Thousand Dollars ($100,000.00). Their cumulative residuals in the last five years exceed the amounts collected by the DGA and WGA for all of their members from the levies in Europe. The Guilds have never considered denying National Treatment—in effect equal treatment—to the foreign members of the creative community who work under our agreements. In light of the U.S. Guilds' practices and policies, it makes little sense that National Treatment is then denied to the American creative community.

The second consideration is a pragmatic one. Is the challenge to National Treatment purely a matter of approach to copyright, or is it fundamentally a matter of trade? Given the world leadership and market share of U.S. film and television product, is the denial of National Treatment a function of the desire of other nations to develop a legal rationale for declining to send hundreds of millions of dollars annually to the U.S. and instead to use these funds for the subsidization of their own film industry and creative community? If this is so, can these problems ever be resolved in a WIPO context, or must they be resolved in GATT?

Regardless of the forum, the challenge to National Treatment as the norm must be stopped. From the perspective of the creative community, the judgment of the Berne founders in favor of National Treatment remains sound and must be protected and expanded for directors, writers, performers and producers. To do otherwise would result in the discouragement of creativity and the erection of barriers in the form of borders to intellectual property to the disadvantage of the U.S. and world economies.

[9] Generally, the European legal concept requiring artists to receive ongoing equitable remuneration from uses of their work is one we applaud. This is not required by U.S. law, and to the extent it has been achieved in the U.S., it has been a product of the work of strong Guilds and Unions and the frequent sacrifices of their members to obtain these protections.

[10] There is another significant distinction between the U.S. and European systems that greatly impacts on the U.S. creative community. The statutory approach protects rights of remuneration (residuals) from substantial losses as a result of a bankruptcy or a transfer of rights without an assumption by the purchaser. The wave of over two dozen entertainment bankruptcies in the last few years, and the increasing trade and exchange of film libraries without the assumption of residual obligations, has continued to put these important rights in jeopardy. To that extent, the European system is superior from the view of the U.S. creative community.

94

Mr. Chairman and members of the Subcommittee, thank you for the opportunity to appear before you today on this important issue.

Mr. HUGHES. Mr. Hadl.

### STATEMENT OF ROBERT D. HADL, VICE PRESIDENT AND GENERAL COUNSEL, MCA INC.

Mr. HADL. Thank you, Mr. Chairman. I don't have a prepared summary of my statement.

I just thought I would spend a few minutes reviewing with you the world as I see it in this area and where we may be going and what we might be able to accomplish.

Mr. HUGHES. That would be helpful.

Mr. HADL. I think that the most critical thing to recognize is that the subject we are dealing with today, national treatment, is a piece of a larger picture.

The larger picture also includes quotas in Europe and subsidies which are distinct from and distinguishable from the kind of subsidy that takes place here when money attributable to U.S. works is kept and used, for example, for French productions.

Quotas are something we must deal with. They are an anathema to us. They have no basis in policy as far as the United States is concerned.

And obviously if we have quotas and we can't get our films or television programs on European television, then we are not even going to be receiving any levies because nobody is going to be able to copy your film or your television program if it's not on in the first place.

The subsidies at the box office, the subsidies from the monthly television bills are all part of the piece.

The numbers I have suggest that in 1992 they totaled over $600 million in the European Community and that the French total alone was roughly 50 percent of that.

National treatment is another piece of this. It's a very important piece and it's another way in which American product is discriminated against in the European Community.

Congressman Berman asked about the French levy. Let's see if we can put that in the right perspective.

Last year in France alone they collected roughly $100 million from the blank tape levy. The way it works is that it is divided first into three parts between the authors, the producers, and the performers.

That money is given to a collecting society representing each of those three groups.

Mr. HOWARD BERMAN. Three different collecting societies.

Mr. HADL. Three different collecting societies. Each of those societies is mandated by the law to deduct 25 percent of what it gets and to use that for cultural and social purposes.

I think that's an important distinction because it's the society itself which uses the money. It's not that it's taken off the top by the Government.

Second, that leaves 25 percent when you take off the cultural fund for each of the groups.

17

95

The French, because of the membership of the United States in the Berne Convention, recognize that the author's share must be shared with American interest.

However, they have applied tests to the producer's share and the performer's share which effectively preclude and exclude us from any participation in those shares.

The two tests they apply are one, you have to be a member of some international convention other than the Berne Convention to get one of those shares.

Or you must first fix the product, the American work, in France to be eligible.

We can deal with the second one very quickly. How many American films are first fixed in France or television programs? The number is very small. So that is clearly an attempt to discriminate.

The comparable test that I come up with in reverse is why don't we have a first pressing test for French wine?

And why don't we say that you have to first press the grapes in the United States before you can distribute the wine in this country or receive compensation?

To me, that would be an equivalent to what they are doing in terms of saying you have to have a first fixation of American work in France before you can receive royalties under the blank tape levy.

The other test about joining an international treaty or that if you are a member of another treaty they recognize clearly doesn't apply to the so-called videogram producer because there is no other international treaty in their view which mentions the videogram producer.

There is the Rome Convention on neighboring rights. But they have to recognize that that treaty just doesn't mention the videogram producer.

They then come back and say or we say that the videogram producer is clearly by any other name a film producer and he is covered by the Berne Convention.

And the Berne Convention should apply and therefore we should be receiving those royalties.

Regrettably, the Minister of Culture in France, Jacque Lang, who was in office up until the recent change in government, when presented with these facts rejected that claim and said in a letter to the industry after official claims had been filed in France to receive this money, rejected those claims and said sorry.

There is no international convention that applies to videogram producers. You're out.

And of course because we are not members of the Rome Convention, you don't get the performers share either.

We are receiving of the $25 million which does apply, approximately 30 percent of that share. And there are some problems with that.

But it goes to show what we would be receiving if we were also receiving a piece of the producer's share and the performer's share.

Mr. HOWARD BERMAN. If I could just interrupt. Thirty percent?

Mr. HADL. Of the $25 million. So we are getting $7½ million out of $100.

Mr. HOWARD BERMAN. And that is going to the authors?

96

Mr. HADL. The $7½ million goes to Americans. Yes. It goes to, quote, authors because of an agreement between the writers, directors and American producers. We have agreed on a sharing of those funds.

But American interests are receiving $7½ million of the $100 million that was collected.

Mr. HOWARD BERMAN. And that means they do acknowledge that collective bargaining arrangement.

Mr. HADL. No. They don't recognize the collective bargaining arrangement. They recognize that American interests are entitled to 30 percent of the $25 million. How we divide the money is our business.

Mr. HUGHES. But the only amount that we receive is a share of that first fund dealing with authors which amounts to $7½ million out of $100 million.

Mr. HADL. That's exactly right. And you would have to say, as I have indicated in my testimony, that we were better than 50 percent at the box office last year in France where we were probably 70 or 80 percent in the home video market.

We were very substantial in television. The 7½ percent is obviously inadequate and discriminatory amount. They're keeping a lot of that other money.

The same is true in other countries of Europe. And as Mr. Roth just said, when you add it all up we are leavings tens of millions of dollars on the table every year.

What can we do about it? I certainly applaud everything I've heard this morning from the U.S. Trade Representative's Office.

Their desire and willingness to improve the Dunkel text and see that the producer's shares and the performer's shares are included in any final agreement we might have I think is the best solution we might have in the near term.

I certainly also want to commend WIPO for its activities with respect to the Berne Protocol and the new instrument.

Those are more long-range activities, however. I think they are going to take 3 to 5 years to complete. Whereas if fast track is approved, I understand the date is December 15 and that's a much more near-term solution as far as I'm concerned, and one which will dramatically affect the interests of U.S. nationals and people who are U.S. copyright owners.

That in effect is where I am and I hope the U.S. Government and the direction it will move on. Thank you very much.

Mr. HUGHES. Thank you, Mr. Hadl.

[The prepared statement of Mr. Hadl follows:]

PREPARED STATEMENT OF ROBERT D. HADL, VICE PRESIDENT AND GENERAL COUNSEL, MCA INC.

Mr. Chairman and members of the Committee. My name is Robert D. Hadl and I am Vice President and General Counsel of MCA Inc. MCA is a diversified entertainment company with interests in motion pictures, television, music, records, theme parks, cable television, theaters and other related entities.

The subject of today's hearing is "national treatment." In my judgment, national treatment is the most important issue facing the United States in international copyright. It transcends all other issues and must be resolved favorably by U.S. negotiators if the copyright industries in the United States and their creative constituencies are to prosper and grow.